[650 NYS2d 173]

T.D. et al., Respondents-Appellants, v NEW YORK STATE OFFICE OF MENTAL HEALTH et al., Appellants-Respondents.

First Department, December 5, 1996

## APPEARANCES OF COUNSEL

*Ruth Lowenkron* and *Cliff Zucker* of counsel *(New York Lawyers for the Public Interest, Inc., Disability Advocates, Inc.,* and *Mental Hygiene Legal Service, First Department,* attorneys), for respondents-appellants.

*Arnold D. Fleischer* of counsel *(Robert A. Forte* on the brief; *Dennis C. Vacco, Attorney-General,* attorney), for appellants-respondents.

*Robin E. Jacobsohn* of counsel *(The Bazelon Center for Mental Health Law,* and *Williams & Connolly,* attorneys), for The Bazelon Center for Mental Health Law and others, *amici curiae.*

*Kimberly C. Lawrence* of counsel *(Hinman, Straub, Pigors & Manning, P. C.,* attorneys), for Associated Medical Schools of New York, *amicus curiae.*

*Robert L. Schonfeld* of counsel *(Stein & Schonfeld,* attorneys), for New York State Psychiatric Association, Inc. and another, *amici curiae.*

### OPINION OF THE COURT

Ross, J.

The issues presented for determination in this matter concern the validity of regulations promulgated by the defendant New York State Office of Mental Health (OMH) codified at 14 NYCRR 527.10. The regulations, promulgated on November 7, 1990, state that their purpose is to "seek to ensure the protection of patients who participate in research while, at the same time, facilitating research into the very disorders from which they suffer and which underlie their impairment" (14 NYCRR 527.10 [b]). Contained in the regulations are provisions which set out procedures for, and thereby sanction, the participation of adults and children, who are patients or residents of OMH operated and licensed facilities deemed incapable of giving consent, in so-called "more than minimal risk" nontherapeutic and possibly therapeutic experiments. These studies involve, *inter alia*, the administration of both Food and Drug Administration (FDA) approved and experimental antipsychotic and psychotropic drugs, which are capable of causing permanent harmful or even fatal side effects[1]

---

1. In *Rivers v Katz* (67 NY2d 485, 490, n 1), the Court noted that numerous side effects are associated with the use of antipsychotic and psychotropic drugs, including extrapyramidal symptoms, akathesia (a condition of motor

and/or highly invasive painful testing procedures on subjects with no benefit or only the possibility of a beneficial effect expected from their participation. Moreover, several of the studies involve a medication-free or placebo phase in which subjects, who are being successfully treated with approved drugs, are taken off the medication for a period of time before the experimental medication is introduced, during which time they may relapse and suffer the adverse symptoms of their particular illnesses or disorders.

The challenged regulations attempt to adequately provide, *inter alia*, for prescreening of potential subjects to ensure that participation in a particular study "does not come into substantial conflict with their individual service plans" (14 NYCRR 527.10 [d] [3]), and for obtaining consent or assent from the potential subject or, in the case of individuals who are deemed incapable of giving consent under the regulations, from one of a number of other individuals identified in the regulations as possible surrogates for the purpose of providing consent or from a court of competent jurisdiction (14 NYCRR 527.10 [e]). However, upon our review, we conclude that the challenged regulations do not adequately safeguard and therefore violate the State and Federal constitutional rights to due process, as well as the common-law right to personal autonomy, of the patients and residents in OMH licensed or operated facilities who are, or potentially may be, subjects for the experimentation at issue. In addition, we agree with the hearing court that the Commissioner of the OMH lacked the authority to promulgate the challenged regulations governing human subject research as such authority is given exclusively to the Commissioner of the Department of Health pursuant to article 24-A of the Public Health Law.

The parties do not dispute that this appeal will directly and immediately affect only a very small percentage of the ap-

---

restlessness which includes a feeling of muscular quivering and an inability to sit still), Parkinsonisms (a group of neurological disorders involving abnormally decreased mobility, tremor and muscular rigidity), dystonic reactions (disordered tonicity of the muscles), and dyskinesia (impairment of the power of voluntary movement resulting in fragmentary or incomplete movements). The Court noted specifically that the "most potentially devastating side effect is tardive dyskinesia, an irreversible neurological disorder characterized by involuntary, rhythmic and grotesque movements of the face, mouth, tongue, jaw and extremities". *(Supra,* at 490, n 1.) It should be noted also that in the studies challenged by plaintiffs, numerous adverse incidents have been documented including deaths, suicides, stroke, heart attack, convulsions, hallucinations, neuroleptic malignant syndrome and seizures.

proximately 400 ongoing studies at OMH licensed and/or operated facilities involving "more than minimal risk". However, notwithstanding its apparent narrow scope, the controversy has wide significance since it arises within the larger context of medical research involving human subjects, and necessarily requires a balancing of this State's responsibility to protect individuals who, because of mental illness, age, birth defect, other disease or some combination of these factors, are incapable of speaking for themselves, from needless pain, indignity and abuse, against its worthwhile goal of fostering the development of better methods to diagnose, treat and otherwise care for these same individuals through cooperation with the medical community and private industry.

We are aware of the past abuses that led to the passage of Public Health Law article 24-A (*see*, Memorandum of Member of Assembly Hevesi, 1975 NY Legis Ann, at 274), and must keep in mind that the prevention of exploitation of human subjects is that law's purpose. Public Health Law § 2440 provides as follows: "Safeguarding the rights and welfare of individual human subjects in the conduct of * * * human research projects is a matter of vital state concern. Every human being has the right to be protected against the possible conduct of medical or psychological research upon his [or her] body without his [or her] voluntary informed consent. * * * Accordingly, it shall be the policy of this state to protect its people against the unnecessary and improper risk of pain, suffering or injury resulting from human research conducted without their knowledge or consent."

However, we also recognize this State's concurrent responsibility for "the prevention and early detection of mental illness and for the comprehensively planned care, treatment and rehabilitation of * * * mentally ill citizens" and the complementary State policy "to conduct research and to develop programs which further prevention and early detection of mental illness" (Mental Hygiene Law § 7.01). The balancing and fulfillment of these concurrent responsibilities in accordance with this complementary policy were apparently the impetus for the promulgation of the regulations at issue in this controversy. However, apart from the defendant Commissioner of Mental Health's lack of authority to enact the challenged regulations, the failure of the regulations themselves to properly balance the interests of the researchers and the rights of the subjects is what occasions the violation of plaintiffs' constitutional and common-law rights.

The benefits of, and needs for, the medical research at issue are clear and evident; but at what cost in human pain and suffering to those subjects who are not capable of expressing either their consent or objection to participation? We recognize this as the fundamental problem facing the parties. In the context of these appeals we can only state that, however laudable the ends which defendants seek to achieve may be, those results must be gained through means within their grant of authority and which properly safeguard the rights of the plaintiffs. It may very well be that for some categories of greater than minimal risk nontherapeutic experiments, devised to achieve a future benefit, there is at present no constitutionally acceptable protocol for obtaining the participation of incapable individuals who have not, when previously competent, either given specific consent or designated a suitable surrogate from whom such consent may be obtained. The alternative of allowing such experiments to continue, without proper consent and in violation of the rights of the incapable individuals who participate, is clearly unacceptable. Moreover, the fact remains that the large majority of studies, which are therapeutic and/or proceed upon the informed consent of subjects or are Federally funded, will remain unaffected.

Plaintiffs herein are six individuals who are involuntarily hospitalized pursuant to Mental Hygiene Law § 9.33 at OMH supervised psychiatric facilities, and who have been adjudicated mentally incapable of giving or withholding informed consent. Each has been medicated over his or her objections and therefore fears being considered "incapable"[2] pursuant to the challenged regulations and forced to participate in the types of experimentation specifically challenged in the complaint. The additional plaintiffs are public interest attorneys and advocates who seek to safeguard the civil and constitutional rights of these individuals, and the Director of the Mental Hygiene Legal Service, whose responsibility it is to provide legal assistance to patients and residents of facilities operated or licensed by the Department of Mental Hygiene, of which OMH is a subdivision, and who appears on behalf of all patients in facilities operated or licensed by the defendant OMH. Defendants

2. The challenged regulations at 14 NYCRR 527.10 (c) ( 2) define capacity as follows: "*Capacity* means the patient's ability to understand the purpose, nature, risks, benefits and alternatives (including nonparticipation) of the research, to make a decision about participation, and to understand that the decision about participation in the research will involve no penalty or loss of benefits to which the patient is otherwise entitled."

are the State Office of Mental Health, its Commissioner and the Commissioner of the New York State Department of Health. Various amici representing the medical research community, whose position is tacitly supported by the major pharmaceutical companies that manufacture the drugs used and sponsor much of the research studies at issue, and whose basic motivation is to develop additional modalities of diagnosis and treatment, have also submitted briefs.

## Procedural History

Plaintiffs commenced this action for declaratory and other relief by complaint dated February 21, 1991. Plaintiffs challenged the regulations insofar as they sanctioned the following five categories of experiments: (1) greater than minimal risk nontherapeutic experiments on incapable adults and children; (2) possibly therapeutic experiments on children, performed without the consent of the children's parents or guardians; (3) possibly therapeutic experiments performed on incapable adults which are not approved by a court; (4) possibly therapeutic experiments performed on incapable adults over their objection; and (5) experiments performed on patients without their knowledge.

After extensive discovery, plaintiffs, by notice of motion dated September 3, 1992, moved for summary judgment and defendants, by notice of motion dated November 13, 1992, cross-moved for summary judgment. In its decision dated February 28, 1995 (165 Misc 2d 62), determining the respective motions for summary judgment, the court noted that the plaintiffs contended therein that their challenge would affect only 10 studies in which "incapable" adults and children may be given experimental drugs not yet approved by the United States Food and Drug Administration and may be subject to invasive painful procedures. Six of these 10 studies are Federally funded. The hearing court's decision denied defendants' cross motion and granted plaintiffs' motion for summary judgment to the extent of declaring, *inter alia*, that the regulations codified at 14 NYCRR 527.10 were invalid and unenforceable and that all non-Federally funded research was therefore subject to Public Health Law article 24-A and in violation thereof because the defendant OMH had admittedly not obtained the consent of the Commissioner of Health. Consequently, only 4 out of the originally identified 10 studies were directly affected by the decision.

An order and judgment based on the February 28, 1995 decision was issued on March 20, 1995, from which all parties filed

notices of appeal. Simultaneously, defendants moved to resettle and modify the March 20, 1995 order and judgment on the ground that it was inconsistent with and exceeded the scope of the February 28, 1995 decision. By decision dated April 25, 1995, the court granted defendants' motion and issued a new order and judgment which was entered on June 26, 1995. Said order and judgment vacated the March 20, 1995 order and judgment, denied.defendants' motion for summary judgment and granted plaintiffs' motion for summary judgment to the extent of declaring, *inter alia*, that: (1) the challenged regulations were promulgated by the Commissioner of OMH in excess of his authority and without the consent of the Commissioner of the Department of Health and are therefore invalid and unenforceable in their entirety for all purposes; (2) that "non-Federally funded human subject research carried out at OMH operated and licensed facilities and involving more than minimal risk and subjects who are minors or adults lacking the capacity to give informed consent to such research is subject to the provisions of Public Health Law Article 24-A and is in violation of those provisions because it has not been consented to by the Commissioner of Health" and; (3) "[F]ederally funded human subject research carried out at OMH operated and licensed facilities that is subject to and in compliance with the federal regulations promulgated by the United States Department of Health and Human Services at 45 CFR Part 46 (now 28 CFR Part 46) is exempt from the provisions of Public Health Law Article 24-A and therefore does not require the consent of the Commissioner of Health." It was further ordered therein that the "Commissioner of Health must advise plaintiffs at least five days prior to the effective date of any promulgated regulations to which consent is to be given by the Commissioner of Health, concerning human subject research carried out at OMH licensed or operated facilities involving more than minimal risk and subjects who are minors or adults lacking the capacity to give informed consent to such research".

On June 27, 1995, defendants filed a notice of appeal from the order and judgment entered June 26, 1995 and thereby invoked the statutory stay pursuant to CPLR 5519 (a) (1). On June 30, 1995, plaintiffs moved in this Court for an order vacating the statutory stay and for a preference in the hearing of defendants' appeal and, on July 13, 1995, filed an amended notice of cross appeal from the June 26, 1995 order and judgment. By order entered August 3, 1995, this Court granted the plaintiffs' motion to the extent of vacating the stay and denied

the application for a preference. However, defendants continued carrying out studies pursuant to the invalidated regulations in violation of the judgment. Plaintiffs commenced contempt proceedings by order to show cause dated August 21, 1995 and obtained a temporary restraining order (TRO) prohibiting defendants from commencing any new nontherapeutic greater than minimal risk experiments on incapable patients based upon surrogate consent in their facilities, or adding any new patients to existing nontherapeutic experiments based upon surrogate consent. Plaintiffs commenced a second contempt proceeding by order to show cause dated January 18, 1996 and a second TRO was obtained in which it was ordered, *inter alia*, that defendants withdraw, in a manner consistent with good clinical practice, all incapable patients who were then subjects of nontherapeutic and possibly therapeutic greater than minimal risk experiments based on surrogate consent, and cease, in a manner consistent with good clinical practice, all nontherapeutic greater than minimal risk experiments on incapable patients, based on surrogate consent, in facilities operated and licensed by the defendant OMH. The TRO allowed defendants to continue therapeutic experiments upon an individual if, within 20 days of the TRO, defendants provided notice to the Mental Hygiene Legal Service and made an application to the court to obtain authorization to continue such research.[3] Defendants thereafter moved in this Court pursuant to CPLR 5704 to vacate the January 18, 1996 TRO. The application was denied by order of this Court (Tom, J.) on January 29, 1996.

The TROs were subsequently modified pursuant to so-ordered stipulations entered into by the parties dated February 9, 1996 and March 11, 1996. The modifications clarified definitions, adjourned compliance dates and allowed the defendants to commence and continue (1) possibly therapeutic experiments on children whose parents or guardians placed the children in the experiments, believing such to be in the child's best interests, and (2) possibly therapeutic experiments on adult

---

· **3.** The TRO stated that for the purposes thereof, the term "therapeutic research" is defined as research for which an Institutional Review Board (a human research review committee established and approved under Public Health Law article 24-A or under 45 CFR part 46 [now 28 CFR part 46] *[see,* 14 NYCRR 527.10 (c) (7)]) has determined that the research holds out a prospect of direct benefit and is important to the health or well-being of the patient and is only available in the context of the research. Nontherapeutic research was defined therein as all research which is not therapeutic research as that term was defined in the TRO.

subjects where consent was given by a subject-designated proxy, which specifically authorizes proxy consent to therapeutic experiments. By virtue of an additional stipulation dated March 12, 1996, the parties agreed to continue to abide by the terms of the TROs as modified without prejudice to each party to return to court in the event further circumstances so warrant.

### Validity of the Regulations as Promulgated by the Commissioner of Mental Health

■ Public Health Law article 24-A, which became effective September 1, 1975 (L 1975, ch 450, § 2), was enacted specifically to address, *inter alia*, abuses then occurring in State-run facilities, particularly in State mental health facilities in the area of medical research involving human subjects (*see*, Memorandum of Member of Assembly Hevesi, 1975 NY Legis Ann, at 274). As noted, *supra*, section 2440 of the Public Health Law provides that "[s]afeguarding the rights and welfare of individual human subjects in the conduct of * * * human research projects is a matter of vital state concern" and that "it shall be the policy of this state to protect its people against the unnecessary and improper risk of pain, suffering or injury resulting from human research conducted without their knowledge or consent". Public Health Law § 2442 provides generally that no research may be conducted in this State in the absence of the voluntary informed consent subscribed to in writing by the human subject, and section 2444 thereof requires that each public or private institution or agency that conducts or proposes to conduct or authorize human research shall establish a human research review committee to, *inter alia*, review human research activities at the institutions. Public Health Law § 2446 provides the Commissioner of Health with the power to promulgate such rules and regulations as shall be necessary and proper to effectuate the purposes of article 24-A. Section 2445 of the Public Health Law provides, however, that the article does not apply to the conduct of human subject research that is in compliance with policies and regulations promulgated by an agency of the Federal Government for the protection of human subjects. Thus, the language of article 24-A clearly gives the Commissioner of Health the mandate to oversee and power to regulate the conduct of human subject research in this State not otherwise in compliance with and/or subject to Federal regulations providing for the protection of human subjects.

At the time Public Health Law article 24-A was enacted, the then-existing version of the Mental Hygiene Law provided for a single Department of Mental Hygiene (*see*, L 1972, ch 251, §§ 1.03, 1.05 and 7.01 *et seq.*). The department was given broad jurisdiction to fulfill its responsibility "for developing comprehensive plans, programs, and services in the areas of research, prevention, and care, treatment, rehabilitation, education, and training of the mentally ill, mentally retarded, and those suffering from alcoholism, narcotic addiction, or drug abuse" (L 1972, ch 251, § 7.05 [a]). The Commissioner was provided with the power to "adopt regulations necessary and proper to implement any matter under his jurisdiction" (L 1972, ch 251, § 9.01). There was no reference in the Mental Hygiene Law as it then existed to human subject research and, while the department was charged with the responsibility to foster research, it appears that the emphasis of the department was placed primarily upon "prevention, diagnosis, examination, care, treatment, rehabilitation [and] training" (L 1972, ch 251, § 9.03 [a]).[4]

The conclusion to be drawn from the language and legislative history of the two enactments at this juncture in the analysis is that at the time Public Health Law article 24-A was enacted, the intent of the Legislature with respect to the area of research was to divide authority between the Department of Mental Hygiene and the Department of Health. The Department of Mental Hygiene was given the responsibility and the appropriate power to foster research in fulfillment of its general responsibility to prevent, diagnose and treat mental illness. The Department of Health, however, was specifically charged with the responsibility to oversee all human subject research and to protect the rights of individuals who may be the subjects of that research in fulfillment of its general mission to protect the public health.

This conclusion is compelled by the basic rules of statutory construction. "It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" and that "where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used [citations omitted]"

---

4. L 1972, ch 251, § 9.03 (a) provided that the "commissioner shall plan, promote, establish, develop, coordinate, evaluate, and conduct programs and services of prevention, diagnosis, examination, care, treatment, rehabilitation, training, and research for the benefit of the mentally ill, the mentally retarded, and those suffering from alcoholism, narcotic addiction, or drug abuse".

(*Patrolmen's Benevolent Assn. v City of New York*, 41 NY2d 205, 208; McKinney's Cons Laws of NY, Book 1, Statutes §§ 92, 94). In addition, "the legislative intent with which statutes are enacted is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and from the objects and remedy in view" (McKinney's Cons Laws of NY, Book 1, Statutes § 95). Where statutes relate to the same subject matter they should be read harmoniously and consistently (*Alweis v Evans*, 69 NY2d 199, 204). It is clear therefore that with the enactment of Public Health Law article 24-A, the Legislature intended to remedy serious abuses then occurring within this State's research institutions and particularly in State-run and State-supervised mental health facilities, and that it did so by vesting the Department of Health with the responsibility and authority to oversee research activities involving humans as subjects being conducted at facilities operated by the Department of Mental Hygiene.

The current version of the Mental Hygiene Law, which created the three autonomous offices within the Department of Mental Hygiene, known as the Office of Mental Health, the Office of Mental Retardation and Developmental Disabilities and the Office of Alcoholism and Substance Abuse, became effective on April 1, 1978 (*see*, L 1977, ch 978, § 53). The powers and authority previously delegated to the Commissioner of Mental Hygiene alone were transferred virtually unchanged to the three offices created within the department (*see generally*, transition provisions, L 1977, ch 978, §§ 38-53). The preamble and legislative findings for the 1977 reorganization of the Department of Mental Hygiene (L 1977, ch 978, § 1) stated that in order to facilitate and implement this State's policy of providing all residents of the State who are disabled with services according to their individualized needs, "the [L]egislature finds and declares that the provision and regulation of services to the separate classes of the mentally disabled can be most effectively and economically carried out by three independent offices, namely an office of mental health, an office of mental retardation and developmental disabilities, and an office of alcoholism and substance abuse which act in close concert with one another".

The preamble stated also that, "[t]he establishment of separate offices as proposed by this act is designed to provide the governmental framework within which available resources will be more effectively brought to bear in providing care and treatment for the different classes of disabled persons. The

division of responsibilities for the care of the mentally disabled among three separate and autonomous offices will enhance the accountability of these governmental entities not only to the governor and legislature but also to the client groups they are designed to serve and will provide each office the measure of independence necessary in designing and implementing discrete programs of prevention, care and treatment for such client groups."

The declaration of policy of article 7 of the Mental Hygiene Law (Mental Hygiene Law § 7.01), which specifically provided for the creation of the Office of Mental Health, as noted *supra*, states that, "it shall be the policy of the state to conduct research and to develop programs which further prevention and early detection of mental illness; to develop a comprehensive, integrated system of treatment and rehabilitative services for the mentally ill." The declaration provides further that, "[t]he office and its commissioner shall plan and work with local governments, voluntary agencies and all providers and consumers of mental health services in order to develop an effective, integrated, comprehensive system for the delivery of all services to the mentally ill and to create financing procedures and mechanisms to support such a system of services to ensure that mentally ill persons in need of services receive appropriate care, treatment and rehabilitation close to their families and communities."

The emphasis on prevention, treatment and the provision of services for the mentally ill, in the legislation creating the Office of Mental Health, remains the same as it was for the Department of Mental Hygiene (*see generally*, Mental Hygiene Law art 7). The grant of authority was not broadened and, while the office remains charged with the responsibility to foster research, no specific reference to human subject research is contained therein.

An administrative agency possesses only the powers expressly delegated to it by the Legislature together with those powers required by necessary implication (*Matter of Beer Garden v New York State Liq. Auth.*, 79 NY2d 266, 276). The "scope of [an agency's] authority under its enabling statute must be deemed limited by its role as an administrative, rather than legislative, body" (*Boreali v Axelrod*, 71 NY2d 1, 6). The fundamental rule of construction, that where a statute describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what was not included or omitted was intended to be omitted or excluded

(McKinney's Cons Laws of NY, Book 1, Statutes § 240), applies herein as well. It has been stated that the rule is especially applicable to the clause of a statute defining the powers of a new office created by the statute itself (McKinney's Cons Laws of NY, Book 1, Statutes § 240).

The interpretation urged by defendants, that while the Department of Health has authority to oversee human subject research generally, the OMH has the authority to regulate human subject research involving mental illness, is unsupported by the plain language of the enactments, the clear legislative intent and the legislative history. Defendants' construction would necessarily result in a conflict between the two enactments, with two agencies empowered to regulate the same specific area. This result would not be consistent with the principle of statutory construction that "a court should not find that the Legislature intended two separate agencies to exercise concurrent jurisdiction unless no other reading of the statute is possible" (*Matter of Ardizzone v Elliott*, 75 NY2d 150, 157). Moreover, in this particular instance, the oversight of one agency by another makes practical sense. Each department is empowered to act within its own area of expertise, and the potential for conflict within the Department of Mental Hygiene, by which the rights of human subjects potentially could give way to the goal of promoting research, the very evil sought to be remedied by the statute, would be eliminated. Furthermore, defendants' argument, that "[n]othing in Article 24-A prohibits another State agency from regulating human subject research concerning a matter within its particular statutory jurisdiction, such as OMH's regulation of mental illness research," is unpersuasive. Defendants seek to vest OMH with the power to regulate human subject research by negative implication. Since State agencies can only promulgate regulations in accordance with powers expressly given to them by the Legislature (*Matter of Beer Garden v New York State Liq. Auth., supra*; *Matter of Consolidated Edison Co. v Department of Envtl. Conservation*, 71 NY2d 186), the authority to promulgate regulations covering certain subject matter not expressly given to the agency cannot be implied from the absence of a specific prohibition in a prior enactment. This is especially true where, as here, the prior enacted statute, Public Health Law article 24-A, expressly conferred the same authority upon another State agency and was left unchanged by the Legislature when the subsequent legislation reorganizing the Department of Mental Hygiene was enacted. Repeal or

modification of legislation by implication is not favored (*Matter of Consolidated Edison Co. v Department of Envtl. Conservation, supra,* at 195). "Absent an express manifestation of intent by the Legislature—either in the statute or the legislative history—the courts should not presume that the Legislature has modified an earlier statutory grant of power to an agency" (*supra,* at 195, citing *Alweis v Evans,* 69 NY2d 199, 204, *supra; People v Newman,* 32 NY2d 379, 389-390, *cert denied* 414 US 1163). Generally, a statute is not deemed impliedly modified by a later enactment unless the two are in such conflict that both cannot be given effect (*supra,* at 195). No such conflict exists between article 24-A of the Public Health Law and the provisions of the Mental Hygiene Law reorganizing the Department of Mental Hygiene and creating the Office of Mental Health with respect to the issues presented herein.[5]

We agree with the court's conclusion that research subject to and conducted in compliance with the Federal regulations governing the protection of human subjects is not subject to Public Health Law article 24-A. As noted, *supra,* Public Health Law § 2445 expressly provides that the provisions of article 24-A shall not apply to such research. In practical terms, research projects that are subject to and conducted in compliance with the applicable Federal regulations are those that are Federally funded. This was recognized in the legislative memorandum supporting the passage of Public Health Law article 24-A, wherein specific examples of abuses were documented and it was stated that "Federal regulations, promulgated since the occurrence of these incidences, cover those situations where federal funds are involved. This bill covers those remaining situations where federal regulations do not apply." (Memorandum of Member of Assembly Hevesi, 1975 NY Legis Ann, at 275.) The apparent reason for the exclusion of Federally funded research is that such research is subject to the comprehensive

---

5. We specifically reject defendant's suggestion that Mental Hygiene Law § 33.03 (b) (4) provides additional authority allowing the OMH's promulgation of the challenged regulations. The section, entitled "Quality of care and treatment", establishes the requirement that persons receiving services for mental disabilities be given care and treatment suited to their needs, which is humanely administered with full respect for the patients' dignity and personal integrity. Specifically, Mental Hygiene Law § 33.03 (b) (4) requires that there be consent given by the patient before "surgery, shock treatment, major medical treatment in the nature of surgery, or the use of experimental drugs or procedures". The section is not at all concerned with research and assumes that the patient has the ability to consent. The reference to experimental drugs or procedures is clearly a reference to their therapeutic use in treatment.

oversight of the United States Department of Health and Human Services ([HHS]; *see*, 28 CFR 46.103 [formerly 45 CFR 46.103]). Protocols must be submitted to HHS for approval prior to the commencement of the research and HHS may impose additional safeguards for protection of the human subjects (28 CFR 46.123-46.124 [formerly 45 CFR 46.123-46.124]). Research which is not Federally funded is subject to the provisions of Public Health Law article 24-A, which prevail over the challenged regulations.

Defendants maintain that the non-Federally funded research conducted at OMH facilities is exempt from Public Health Law article 24-A by virtue of its voluntary compliance with applicable Federal regulations as evidenced by the issuance of a Multiple Project Assurance (MPA) to OMH and The Research Foundation for Mental Hygiene (hereinafter the Foundation).[6] While an MPA is described as an "Assurance" issued by HHS to the defendants, it is actually a promise or assurance given by defendants to HHS to the effect that they will comply with HHS regulations for the protection of human subjects. The introductory language of the Assurance issued to OMH and the Foundation for the period November 1, 1987 through October 31, 1992 states: "The New York State Department of Mental Hygiene (including its component agencies) and the Research Foundation for Mental Hygiene, Inc. (RFMH), hereinafter referred to as 'these institutions' hereby give assurance that they will comply (separately and/or jointly) with the Department of Health and Human Services (HHS) regulations for the Protection of Human Subjects (45 CFR 46 [now 28 CFR] as amended) as specified below." The qualifying phrase "as specified below," contained in the above introductory paragraph of the MPA, is significant with respect to defendant's claim of exemption from Public Health Law article 24-A for non-Federally funded research conducted at its facilities, in that it allowed OMH and the Foundation to exempt themselves from certain Federal reporting requirements. The updated MPA issued in October of 1992 in view of the prior MPA's termination contains the same exemptions. Among those reporting requirements the defendants exempted themselves from was that specified in 28 CFR 46.103 (b) (5). That section provides for prompt reporting to the Institutional Review Board, appropri-

---

**6.** While the Foundation is not a named party to this action, we note that the record demonstrates that it plays an integral part in the way OMH carries out the requirements of the Assurance as well as in the funding and conduct of the research at issue (*see, infra*).

ate institutional officials and the appropriate Federal department or agency head of (i) any unanticipated problems involving risks to subjects or others, or instances of serious or continuing noncompliance with the Federal regulations, requirements, or determinations of the Institutional Review Board (IRB)[7] and (ii) any suspension or termination of IRB approval for the research. In its place, defendants obligated themselves to an "alternative reporting requirement" for non-Federally funded research, which requires that the information, which would have been reported to HHS, be reported to the Foundation. We note that in correspondence dated October 29, 1987 with the Foundation and OMH regarding the approval of the November 1, 1987 to October 31, 1992 MPA, the HHS Assurance Coordinator stated that "[a]mong the most important elements of the Assurance are the reporting requirements to this office."

The Research Foundation for Mental Hygiene is described by the defendants as a "not for profit corporation which generally oversees all human research at OMH operated facilities". However, review of the record demonstrates that this description of the Foundation is somewhat incomplete. The Foundation, while ostensibly an autonomous corporation, in fact has a very close relationship with the Department of Mental Hygiene and OMH. The contract between the Foundation and the Department of Mental Hygiene, executed October 1, 1981, states that the Foundation's main responsibility is to assist the three autonomous offices of the Department of Mental Hygiene to provide "more extensive conduct of studies, teaching, training and research into the causes, nature and treatment of diseases, disorders and defects affecting the mind brain and nervous system" through the collection and administration of gifts and grants, and assistance in obtaining private sponsorship of studies.

Review of the record demonstrates, however, that the relationship between OMH and the Foundation has evolved beyond that originally defined in that contract. The record contains correspondence to the "Research Foundation for Mental Hygiene/New York State Department of Mental

7. An Institutional Review Board is a committee established at each facility conducting human subject research made up of at least "five members, with varying backgrounds to promote complete and adequate review of research activities commonly conducted by the institution" (28 CFR 46.107 [a]). Public Health Law § 2444 provides for the establishment of human research review committees which are the functional equivalents of the IRB.

Hygiene" and internal documents, e.g., a "Checklist for Preparation of Grant or Contract Proposal" under the heading "New York State Department of Mental Hygiene/Research Foundation for Mental Hygiene, Inc." In addition, the affidavit of the Clinical Research Coordinator of the Foundation states that the Research Foundation generally oversees all supported research programs which involve human subjects at OMH operated facilities, "including but not limited to, research supported by grants and contracts obtained by the Research Foundation". More significant is the statement therein that the Clinical Research Coordinator not only assisted in drafting the challenged regulations but also participates in the day-to-day implementation of the regulations. According to the affidavit, the Clinical Research Coordinator acts as a consultant to the institutional review boards and reviews "all IRB procedures at OMH operated psychiatric centers and research institutes, all research protocols at OMH operated psychiatric centers, and all research protocols at OMH operated research institutes that involve patients at OMH operated psychiatric centers, in order to ensure that they comply with applicable federal and state laws regulations and policies, including the challenged regulations".

Consequently, it is apparent that the plaintiffs' assertion, that oversight by and reporting to, the Foundation is hardly the equivalent of HSS oversight, and in fact does not even constitute independent oversight at all is well founded. The record supports the conclusion that, with respect to non-Federally funded studies, defendants have exempted themselves from important reporting requirements and instead have elected to report to themselves. Therefore, we find that the non-Federally funded research in question fails to comply with the applicable HHS regulations and is therefore subject to Public Health Law article 24-A, which requires the consent of the Commissioner of Health for the conduct of research involving minors, incompetents and mentally disabled persons (Public Health Law § 2444 [2]).

### Constitutional and Common-Law Claims

■ It is evident that, even though the subject regulations have been declared invalid and unenforceable, defendants will seek to continue to carry out the human subject research at issue herein in the future. Therefore, analysis of the plaintiffs' constitutional and common-law claims is appropriate. "The fact that the court may be required to determine the rights of

the parties upon the happening of a future event does not mean that the declaratory judgment will be merely advisory" (*New York Pub. Interest Research Group v Carey*, 42 NY2d 527, 530). "In the typical case where the future event is an act contemplated by one of the parties, it is assumed that the parties will act in accordance with the law and thus the court's determination will have the immediate and practical effect of influencing their conduct" (*supra,* at 530-531).

The record demonstrates that defendants' experiments involving more than minimal risk expose the subjects to, *inter alia*, invasive and painful procedures and/or the administration of psychotropic drugs, antipsychotic drugs and other medications, which have harmful side effects as severe or even worse than similar medications and procedures currently used for treatment. Therefore, defendants' practices for assessing capacity and obtaining consent for such experimentation must, at the very least, provide the same safeguards to the constitutional and common-law rights of the incapable patients, who may be potential subjects of these experiments, as provided to patients over whose objection treating physicians seek to administer, solely for therapeutic purposes, medications, that can cause similar side effects. It must be kept in mind throughout this discussion, that we are dealing herein with research that offers no benefit or only minimal benefit to the subject, as opposed to treatment where the sole motivation is a beneficial therapeutic effect on the patient with minimal adverse side effects. There is no question that the concern for the well-being of potential subjects, which is paramount in the treatment setting, must also be the overriding concern in the research context and should be the focus of defendants' protocols and practices in assessing capacity and obtaining informed consent from capable individuals and/or from properly designated surrogates of individuals found to lack the capacity to give or withhold consent.

The provisions of the invalidated regulations set forth the practices for enrolling potential subjects into the studies, which defendants consider acceptable and presumably have followed since promulgating the regulations in 1990. The regulations generally require that participation as a subject in a research project must be based upon informed consent (14 NYCRR 527.10 [d], [e] [2] [i]). Plaintiffs specifically do not challenge those provisions regarding informed consent for persons capable of providing consent and do not challenge experiments involving minimal risk. Therefore, the focus herein is upon the

provisions applicable to children and adults deemed incapable of giving or withholding consent for participation in experiments involving more than minimal risk. Such individuals are in a position analogous to that of involuntarily committed individuals, who, in the context of treatment, may be subject to administration of medication without their consent and/or over their objection.

In *Rivers v Katz* (67 NY2d 485, *supra*), the leading case in this State on the subject, the Court of Appeals reaffirmed the principle of personal autonomy in this State's common law (*see, Schloendorff v Society of N. Y. Hosp.*, 211 NY 125, 129 [Cardozo, J.]; *Matter of Storar*, 52 NY2d 363, *cert denied sub nom. Storar v Storar*, 454 US 858) and explicitly held that "the due process clause of the New York State Constitution (art I, § 6) affords involuntarily committed mental patients a fundamental right to refuse antipsychotic medication" (67 NY2d, *supra*, at 492). Plaintiffs in *Rivers* were involuntarily committed patients in State institutions whose refusals to be medicated with antipsychotic drugs were overruled following the administrative review procedures then in effect.

While the Court rejected any arguments that either mental illness or involuntary commitment, in and of itself, in any way diminishes the mentally ill individual's fundamental liberty interest in avoiding unwanted administration of antipsychotic medication, it recognized that the right to reject treatment with such medication is not absolute, and that in certain emergency situations, such as where the individual presents an imminent danger to himself or those in immediate proximity to him, that right may yield to compelling State interests. However, the Court expressly rejected any implication that State interests unrelated to the patient's well-being or those in close proximity to the patient can outweigh the individual's fundamental autonomy interest (67 NY2d, *supra*, at 495, n 6).

The Court held that in situations where the State's police power is not implicated, and the patient refuses to consent to the administration of antipsychotic drugs, there must be a judicial determination of whether the patient has the capacity to make a reasoned decision with respect to the proposed treatment before the drugs may be administered pursuant to the State's *parens patriae* power. The Court stated explicitly that "[s]uch a determination is uniquely a judicial, not a medical function [citations omitted]" (67 NY2d, *supra*, at 496). The Court also stated that the determination should be made at a de novo hearing following the exhaustion of administrative

review procedures, and that the patient should be afforded representation by counsel (67 NY2d, *supra,* at 497). Thus, in *Rivers,* where the defendants sought to administer the medication not because the patients were a danger to themselves or others, but rather to improve and/or prevent deterioration of the patients' conditions, a judicial determination of capacity was required. Indeed, such judicial review has since been incorporated into Mental Hygiene Law provisions regarding the commitment, treatment and retention of mentally ill individuals in hospitals *(see generally,* Mental Hygiene Law art 9—Hospitalization of the Mentally Ill).

The *Rivers* Court found that the administrative review procedures then in effect failed to sufficiently protect the due process rights of plaintiffs guaranteed by the New York State Constitution, in that, *inter alia,* "the regulations [did] not articulate the standards to be followed or criteria to be considered at each stage of the administrative process, i.e., what the need is for the particular drug, whether a particular drug is the least intrusive, whether it is capable of producing the least serious side effects, and the proper length of its use" (67 NY2d, *supra,* at 498). In addition, the Court determined that Mental Hygiene Law § 33.03 (b) (3)[8] is applicable to the administrative review process such that medical determinations as to the need to administer psychotropic drugs must honor the patient's due process rights and be made in accordance with accepted professional judgment, practice and standards *(supra,* at 498-499).

Plaintiffs herein also have the benefit of the protection of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. In *Washington v Harper* (494 US 210), the United States Supreme Court addressed the question of whether the State of Washington violated the due process rights of a prison inmate by giving him antipsychotic drugs against his will. Although the inmate did not prevail, the Court found that the inmate's interest in avoiding involuntary administration of antipsychotic drugs was protected under the Fourteenth Amendment's Due Process Clause. The Court stated that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" *(supra,* at 229). Thus, the Court held that given the requirements of the prison environment, the

---

**8.** Mental Hygiene Law § 33.03 (b) (3) requires that "in order to assure protection of patients in their care and treatment [there must be an] order of a staff member operating within the scope of a professional license for any treatment or therapy based on appropriate examination".

Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs, against his will, if the inmate is dangerous to himself and others and the treatment is in the inmate's medical interest (*supra,* at 227).

In *Harper,* the Court reviewed the administrative policy of the Washington State Special Offender Center (SOC), where the plaintiff therein was confined. The SOC in question at the time was a 144-bed correctional institute established by the Washington Department of Corrections to diagnose and treat convicted felons with serious mental disorders. The Court found that the policy referred to as SOC Policy 600.30, given the requirements of prison environment, adequately protected the inmate's privacy interests and due process rights. SOC Policy 600.30 provided the inmate with a multistep review process prior to the involuntary administration of the medication. The policy had several substantive and procedural components that had to be satisfied before an inmate could be medicated against his will.

In *Riggins v Nevada* (504 US 127), the Supreme Court addressed a similar situation involving an inmate in a Nevada prison who was given antipsychotic medication against his will during his trial on murder and robbery charges. The Court stated that "[u]nder *Harper,* forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial [citations omitted]" (504 US, *supra,* at 135).

Therefore, in order to be sustained as constitutional and otherwise viable, the regulations here at issue must, at the very least, contain appropriate and specific provisions for notice to the potential subject that his or her capacity is being evaluated and for appropriate administrative and judicial review of a determination regarding capacity.

The regulations generally provide that no capable patient shall become involved or remain in research over his or her objection and that such patients have the right to withdraw consent to participate after the commencement of the research (14 NYCRR 527.10 [e] [2] [vi], [vii]). However, once a patient is deemed incapable, his or her ability to have an objection to participation or continued participation honored is severely, and as we find below, in some instances impermissibly, curtailed by provisions allowing for override of the objection

*(see,* 14 NYCRR 527.10 [e] [2] [viii]) and for surrogate consent by individuals other than legal guardians and/or individuals designated pursuant to a durable power of attorney *(see,* 14 NYCRR 527.10 [e] [2] [iv]). Thus, the determination of capacity or lack thereof is the key determination under the regulations. This is evident also from the general provisions of the regulations regarding research on incapable individuals.

The general principle under which the regulations operate with respect to the participation of incapable patients is stated at 14 NYCRR 527.10 (d) (6). There, it is provided that research that involves patients who lack the capacity to consent may not be approved unless the IRB has determined and documented that the study cannot be conducted without the involvement of incapable subjects. The section provides further that research that involves more than minimal risk and/or invasive procedures may only involve incapable subjects if the IRB determines and documents that the project is likely to produce knowledge that has overriding therapeutic importance for the understanding or treatment of a condition that is presented by the patient. However, paragraph (7) of section 527.10 (d) provides that an IRB may waive the conditions established in the above-stated paragraph (6) for a patient who lacks the capacity to consent, if the IRB determines and documents that the research holds out a prospect of direct benefit that is important to the general health or well-being of the patient and is available only in the context of the research. The term "benefit" is left undefined, and therefore could be viewed as any benefit important to the general health and well-being of the patient whether or not related to the patient's condition. Moreover, it is apparent that "a prospect of direct benefit" important to the general health or well-being of the subjects is something significantly less than what is expected or intended in a treatment context. Thus, it is apparent that, under the general principles of the regulations, if a research project holds out any prospect for a direct benefit that may or may not relate to the specific condition presented by the incapable patients, the limiting conditions of 14 NYCRR 527.10 (d) (6) may be waived and researchers may involve incapable patients in greater than minimal risk studies, which could be carried out using capable patients, but to which no capable individual would submit. This option provided to researchers is cause for alarm, given the inadequacies of the regulations discussed below.

The OMH regulations define the term "capacity" for the purposes of giving consent as the "patient's ability to under-

stand the purpose, nature, risks, benefits and alternatives (including nonparticipation) of the research, to make a decision about participation, and to understand that the decision about participation in the research will involve no penalty or loss of benefits to which the patient is otherwise entitled" (14 NYCRR 527.10 [c] [2]). At 14 NYCRR 527.10 (e) (2) (ii), the regulations state that where there is reason to believe that the patient may lack the capacity to consent, the IRB has the authority to require that an assessment of the patient's capacity be made by someone who is not affiliated with the research and/or who has specific qualifications and certifications. In addition, at 14 NYCRR 527.10 (e) (2) (ix), it is provided that if the person (or persons) making the initial assessment of capacity determines that there is a doubt as to a patient's capacity, same shall be reported to the IRB and the IRB shall designate another appropriate person to examine the patient for the purposes of determining capacity to consent to participation in the research. Based upon a report of both assessments, the clinical director or his/her functional equivalent shall make a determination of the patient's capacity.

Once an individual is determined to lack capacity pursuant to the regulations, consent may be obtained from "an individual appointed pursuant to a duly executed durable power of attorney specifying the authority to consent or withhold consent to participation in research; or * * * an individual designated by the patient to consent or withhold consent to the patient's participation" who is not a current employee, servant or agent of the facility where the research is taking place or otherwise affiliated with the research project (14 NYCRR 527.10 [e] [2] [iii]). However, if a patient lacks the capacity to consent to participation and has not designated a person under the above provisions, the regulations provide that consent may be obtained from the patient's spouse, parent, adult child, adult sibling, guardian or a committee of the person which is authorized to consent to research. If none of the above are available, consent may be obtained from a "close friend" or a court of competent jurisdiction (14 NYCRR 527.10 [e] [2] [iv]). The term "close friend" is defined as "an adult who presents an affidavit to the director which states that 'he [or she] is a close friend of the patient and that he has maintained such regular contact with the patient as to be familiar with the patient's activities, health, and religious or moral beliefs and stating the facts and circumstances that demonstrate such familiarity.' A 'close friend' may not be a current employee, servant or agent of the

facility and may not be affiliated with the research project" (14 NYCRR 527.10 [c] [3]).

With respect to minors, the regulations provide at 14 NYCRR 527.10 (e) (3) (i) that if a patient is under 18 years of age, consent shall be obtained from a parent or legal guardian. This portion of the section mirrors and therefore complies with Public Health Law § 2442. However, the section provides further that, if no parent or legal guardian is available, consent may be obtained from an adult family member who is involved in making treatment decisions for the child or from a court of competent jurisdiction (14 NYCRR 527.10 [e] [3] [i]). In addition, it is also provided that the "assent" of the minor must also be obtained in a manner approved by the IRB (14 NYCRR 527.10 [e] [3] [iv]).

The provisions concerning the assessment of a potential subject's capacity do not adequately protect the common-law privacy and due process rights of potential subjects. The regulations do not identify or set out specific or even minimum qualifications for the individual or individuals who initially assess a potential subject's capacity, and do not contain a specific protocol for how the assessment is to be carried out. Further, there are no provisions requiring any notice to the patient that his or her capacity to provide or withhold consent for a particular study is being questioned. Consequently, there is no provision for review of a determination of lack of capacity at the patient's request.

The practical application of the regulations as described by defendants supports this conclusion. Defendants in their brief state that the informed consent procedure is overseen by the IRB, which selects the person or persons who may assess patient capacity.[9] However, defendants state also that, in practice, capacity is frequently assessed by the researcher if the research involves no more than minimal risk but, as the risk and complexity of the research increase, IRBs usually require that someone other than or in addition to the researcher assess capacity. The Clinical Research Coordinator for the Research Foundation for Mental Hygiene, who, as noted above, assisted in drafting and participates in the day-to-day

9. The record demonstrates that the IRBs conduct initial and "annual" reviews of the procedures for determining capacity and obtaining informed consent devised for each study. IRBs do not review the work of the researchers on a day-to-day or even monthly basis. Moreover, plaintiffs maintain, and defendants do not dispute, that IRBs may review protocols for numerous studies in one session.

implementation of the regulations at issue, stated the following in her affidavit regarding the 10 studies specifically challenged by plaintiffs: "For each of the ten protocols, the capacity of potential subjects to consent was evaluated by two licensed health care professionals, one of whom was not affiliated with the research. It was considered desirable to include one person affiliated with the research in the process of assessing capacity because of the need to determine capacity in relation to the specific research protocol (*i.e.*, a patient may possess sufficient capacity to consent to participate in one protocol but not another). Also, capacity is often assessed as part of the informed consent process, and an investigator affiliated with the research is most qualified to explain the research to the patient and answer questions." While the regulations provide that an "investigator" shall seek consent "only under circumstances that provide the prospective subject or his/her representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence" (14 NYCRR 527.10 [e] [1] [i]), they do not specifically require that the investigator be included in the determination of the capacity. We do note that review of the research protocols contained in the record on appeal demonstrates that the "principal investigator" for each study is a medical doctor. However, in many, if not all, cases contained in the record, the principal investigator is either affiliated with or employed by either the Research Foundation for Mental Hygiene, its affiliate or subdivision, the Nathan S. Kline Institute for Psychiatric Research or the institution at which the research is being carried out.

It is apparent therefore that the regulations were drafted to provide maximum flexibility in the assessment of capacity with the primary consideration being the researchers' need to determine an individual patient's suitability for the specific study involved. To that end, the IRB has complete discretion in designating the individual or individuals who will make the assessment and who will thereafter review the researcher's initial assessment; no other requirements are stated. While the regulations provide the IRB with the authority to have persons not affiliated with the research evaluate capacity, in practice, it is often the researchers or others affiliated with them who conduct interviews and make the initial determination.

Pursuant to both the challenged regulations and the Federal regulations, IRBs at each institution are charged with the duty to monitor the research (14 NYCRR 527.10 [c] [5]; 28 CFR

46.103). However, the record supports the plaintiffs' statement that, in practice, the IRBs do not conduct in-depth evaluations *(see,* n 9, *supra),* and that individuals employed by the Research Foundation for Mental Hygiene conduct the day-to-day monitoring for compliance as consultants to the IRBs.

This practice is unacceptable given the significance of a determination of lack of capacity and the absence of any provision for patient-requested review of the determination of capacity, and in light of the provision for surrogate consent contained in 14 NYCRR 527.10 (e) (2) (iv). Subdivision (e) (2) (iv) of the regulations allows for any one of a number of individuals, other than a legal guardian or a committee of the person, to be accepted as a surrogate for the purposes of obtaining informed consent. While these individuals may be related to the patient, or, in the case of a "close friend" as defined in the regulations, swear in an affidavit that they have sufficient contact and concern for the patient to be allowed to give consent, in neither case is the individual appointed as guardian pursuant to a finding of legal incapacity pursuant to article 81 of the Mental Hygiene Law *(see,* Mental Hygiene Law § 81.02 *et seq.)*[10] or in any way guaranteed to act in the patient's best interests. In *Rivers v Katz (supra,* at 494), the Court stated that "it is well accepted that mental illness often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently, that many mentally ill persons retain the capacity to function in a competent manner [citations omitted]". Therefore, given that the definition of "capacity" under the regulations is stated in terms of the "patient's ability to understand the purpose, nature, risks, benefits and alternatives (including nonparticipation) of the research" (14 NYCRR 527.10 [c] [2]), and that defendants, in practice, determine a patient's capacity in relation to each protocol, it is possible that, under regulations, an otherwise capable person may be determined to be incapable for defendants' purposes because he or she is found to lack the ability to understand and make a decision about whether or not to participate in a specific study. In that event, neither the determination of lack of capacity itself nor the decisions of the surrogate are reviewable at the

10. Pursuant to Mental Hygiene Law § 81.02 (b), the determination of incapacity shall be based on clear and convincing evidence and shall consist of a determination that a person is likely to suffer harm because: (1) the person is unable to provide for personal needs and/or property management; and (2) the person cannot adequately understand and appreciate the nature and consequences of such inability.

patient's request. Indeed, given the lack of a notice requirement, the patient may not even be informed of either determination and may not even be aware he or she is involved in research. Therefore, we hold that the provisions for determining a potential subject's capacity under the challenged regulations fail to adequately protect the individual's due process rights guaranteed under both the New York State and United States Constitutions and declare them unconstitutional for that reason.

The law with respect to surrogate decision-making in health care has been developed mainly in the context of the termination or withholding of treatment *(see generally, Matter of Westchester County Med. Ctr.*, 72 NY2d 517). The basic rule in New York is that in the absence of specific legislation, and where there is no evidence of personal intent, a surrogate has no recognized right to decide that a patient's quality of life has declined to a point where treatment should be withheld and the patient allowed to die *(People v Eulo*, 63 NY2d 341, 357).

Defendants contend that the reasoning of the case law in this State concerning surrogate decision-making resulting in the withholding of life-sustaining treatment, "suggests that surrogate decision-making that does not involve the withholding of treatment so as to lead to the patient's death is permissible under the common law of this State". Defendants argue therefore that surrogate consent for participation in research, being "quite a different matter" from a decision to withhold treatment, should be allowed. Defendants' argument is unpersuasive with regard to the greater than minimal risk nontherapeutic studies with which we are concerned herein. It is not disputed that participation in studies involving greater than minimal risk exposes the subjects to possible harmful, and even fatal, side effects. Thus, similar substantive and procedural safeguards should be provided to these potential research subjects as are provided to patients in life-sustaining treatment settings.

Defendants also rely on the argument that the Legislature has provided for surrogate decision-making in various other health care treatment situations and maintain that the provisions of their regulations regarding surrogate consent are derived from these statutes. As examples defendants cite Public Health Law articles 29-b (the "do-not-resuscitate law") and 29-C (the "health care proxy law"), and Mental Hygiene Law articles 80 (surrogate decision-making committees and panels for major medical treatment of mentally disabled persons) and

81 (appointment of a guardian for personal needs and property management). However, unlike defendant's regulations, each of these statutory schemes contains provisions for notice to the individual patient and/or exhaustive administrative and judicial review procedures. Section 2983 (3) (a) of Public Health Law article 29-C provides that notice of a determination that a principal lacks capacity to make health care decisions shall promptly be given to the principal orally and in writing where there is any indication of the principal's ability to comprehend such notice. Section 2963 (4) of Public Health Law article 29-B contains an identical provision for notice. Section 80.09 of Mental Hygiene Law article 80 provides for court review of the determination that a patient is in need of surrogate decision-making. Article 81 of the Mental Hygiene Law is a comprehensive statute where the initial appointment of a guardian of the person and/or property is made only upon a judicial determination of incapacity based upon clear and convincing evidence (Mental Hygiene Law § 81.02 *et seq.*).

Defendants contend, however, that Mental Hygiene Law articles 80 and 81 are not appropriate vehicles for obtaining surrogate consent to participation in research because "a person can be capable of providing consent for his or her health care needs in general, and thus ineligible for surrogate decision making pursuant to these statutes, but at the same time be incapable of understanding the issues necessary to provide informed consent to participation in research". Given the absence of notice and review provisions, this contention of defendants states precisely the reason why their practices are unacceptable with respect to greater than minimal risk nontherapeutic experiments. A person otherwise competent to make health care choices may, by defendants' standards, be found incapable to understand the issues necessary to provide consent for research and then be enrolled in a study involving greater than minimal risk based on the consent of a surrogate, without ever being informed. Such a practice is unacceptable for treatment purposes, let alone for research, involving significant risk of harm and offering no benefit.

We also find unacceptable the provisions that allow for consent to be obtained on behalf of minors for participation in greater than minimal risk nontherapeutic research from the minor's parent or legal guardian, or, where no parent or guardian is available, from an adult family member involved in making treatment decisions for the child (14 NYCRR 527.10 [e] [3] [i]). The general principles concerning parental or guardian

consent to medical treatment on behalf of minors were stated by the Court in *Matter of Storar* (52 NY2d 363, 380-381, *supra)* as follows: "A parent or guardian has a right to consent to medical treatment on behalf of an infant (Public Health Law, § 2504, subd 2). The parent, however, may not deprive a child of lifesaving treatment, however well intentioned (*Matter of Sampson,* 29 NY2d 900; *Matter of Vasko,* 238 App Div 128 [other citations omitted]). Even when the parents' decision to decline necessary treatment is based on constitutional grounds, such as religious beliefs, it must yield to the State's interests, as *parens patriae,* in protecting the health and welfare of the child (*Matter of Sampson, supra* [other citations omitted]). Of course it is not for the courts to determine the most 'effective' treatment when the parents have chosen among reasonable alternatives [citation omitted]. But the courts may not permit a parent to deny a child all treatment for a condition which threatens his life [citation omitted]."

We are not dealing here with parental choice among reasonable treatment alternatives, but with a decision to subject the child to nontherapeutic treatments and procedures that may cause harmful permanent or fatal side effects. It follows therefore that a parent or guardian, let alone another adult who may be a member of the child's family, may not consent to have a child submit to painful and/or potentially life-threatening research procedures that hold no prospect of benefit for the child and that may have the same result as a denial of necessary medical treatment. Defendants maintain that the OMH regulations permitting a minor to participate in nontherapeutic greater than minimal risk experimentation upon parental or guardian consent comport with Federal regulations. Even if that is the case, and we do not expressly pass on that issue, such a practice is not acceptable in our view with respect to the non-Federally funded studies at issue here, especially in light of the waiver of strict reporting requirements previously noted. We emphasize, however, that our holding is limited to nontherapeutic greater than minimal risk experimentation. We do not limit a parent or legal guardian's right to consent to a child's participation in therapeutic research that represents a valid alternative and may be the functional equivalent of treatment (*see, Matter of Storar, supra).*

The regulations allow waiver of the requirement of parental consent in certain circumstances. Pursuant to 14 NYCRR 527.10 (e) (3) (iii), "[i]f the IRB determines that a research protocol is designed for conditions or for a subject population

for which parental or guardian permission is not a reasonable requirement to protect the patients (for example, neglected or abused children), it may waive the requirement for the consent of the parent(s,) guardian or adult family member * * * provided an appropriate mechanism for protecting the children who will participate as subjects in the research is substituted". This section is particularly troubling since it both conflicts with Public Health Law § 2442, which provides that no human research may be conducted on a minor in the absence of the consent of a parent or guardian, and clearly violates State and Federal due process requirements, since it allows for what amounts to an ex parte determination by the IRB to dispense with parental or guardian consent and provides no opportunity for those legally responsible for the child involved to challenge the IRB determination. In fact, there is no provision requiring that the parent or guardian be informed that the child is involved in research at all once the IRB has determined that parental consent is not a reasonable requirement. In addition, the provision does not set forth any parameters defining what types of "alternative mechanisms" would be considered appropriate and therefore vests the IRB with impermissibly broad discretion in this area.

Pursuant to Social Services Law article 6, title 1, the determination of whether or not to interfere with or terminate the parent-child relationship is to be made by the Family Court after an appropriately commenced and conducted proceeding (see generally, Family Ct Act, art 6). Specifically, Social Services Law § 383-b provides the local commissioner of health with authorization to give effective consent for medical, dental, health and hospital services for any child who has been found by the Family Court to be an abused or a neglected child, or who has been taken into or kept in protective custody, or removed from the place where he is residing, or who has been placed in the custody of such commissioner. To the extent that the regulations appear to authorize an IRB to make a determination that a particular child or population of children is abused or neglected, or that, in a given situation, the requirement of parental consent may be harmful to the minor, they conflict with the long-established procedures for the protection of children established in the Social Services Law and the Family Court Act. Even if we could assume that when the regulations refer to abused or neglected children they mean children found

by the Family Court to be abused or neglected,[11] under Social Services Law § 383-b, the consent of the local Commissioner of Health should be obtained. Defendants cite no authority to support their contrary position.

Lastly, we examine the portion of the regulations that allow for the objection of an incapable patient to be overridden. While the regulations provide generally that no incapable patient shall become or remain a research subject over his or her objection or over the objection of any of the persons authorized to consent on the patient's behalf (14 NYCRR 527.10 [e] [2] [vii]), that objection can be overridden by "a psychiatrist who is not associated with the research" who "finds and documents that the intervention or procedure involved in the research holds out a prospect of direct benefit that is important to the health or well-being of the patient and is available only in the context of the research and a court of competent jurisdiction specifically authorizes overruling the objection" (14 NYCRR 527.10 [e] [2] [viii]). With respect to children, the regulations provide that a child's objection to participation in research must be honored, except when a child psychiatrist who is neither employed by the facility nor associated with the research finds that the intervention or procedure involved in the research holds out the prospect of direct benefit that is important to the health or well-being of the child and is available only in the context of the research (14 NYCRR 527.10 [e] [3] [v]). It is provided also that if a decision is made to treat a child in the context of a research project over the child's objection, and treatment is not emergency treatment, the Mental Hygiene Legal Service shall be notified and treatment delayed for four calendar days to allow for the Mental Hygiene Legal Service to file an action challenging the determination of the independent psychiatrist.

The provisions allowing for override of a patient's objection do not require notice to the patient or patient's representative, or to the minor or minor's parent or guardian that the patient's objection to participation in the research is being overridden. Therefore, the patient has no opportunity to seek administrative or judicial review of the psychiatrist's determination. While the regulations provide that if a minor is to be treated in the context of a research project over his or her objection,

---

11. We specifically note that the regulations fail to require or even refer to a formal adjudication of neglect or abuse. Moreover, defendants in their brief state that neither OMH nor the Federal regulations condition such a waiver on a formal adjudication of abuse or neglect.

the Mental Hygiene Legal Service is to be notified (14 NYCRR 527.10 [e] [3] [v]), such notice does not take the place of notice to the child's parent or guardian in the first instance. Both sections dealing with participation over the objection of the research subject base the override on the finding of a psychiatrist that the intervention or procedure involved holds out "a prospect of direct benefit" (14 NYCRR 527.10 [e] [2] [viii]; [3] [v]). As with 14 NYCRR 527.10 (d) (7), the nature of the benefit is left undefined. Thus, the benefit while required to be important to the health or well-being of the adult or minor patient, is not required to be a product of the research procedures or even related to the psychiatric condition presented by the patient.

We take notice of the fact that a new generation of more powerful, faster acting psychiatric drugs predicted to be "10 times better than those we have now", with fewer unwanted effects, is forthcoming from the pharmaceutical industry, and that "the race to market is on" with several of the new drugs "close to or already undergoing the first phase of clinical trials, tests for toxicity and side effects in humans" (Goleman, *Research on Brain Leads to Pursuit of Designer Drugs*, New York Times, Nov. 19, 1996, at C1, col 5, and C3, col 4). It has also been reported that "[m]ost major pharmaceutical companies report a surge in research on new psychiatric drugs" (Goleman, *Drug Company Tests*, New York Times, Nov. 19, 1996, at C3, col 4). It is evident that, given the motivation to test these medications and quickly bring them to market, industry-sponsored studies, which will not rely on Federal funds and therefore will not be strictly subject to Federal guidelines and oversight, will proliferate. These developments serve to highlight the importance of safeguarding the rights of incapable adults and minors, who may be potential subjects of greater than minimal risk studies involving psychiatric medications, through constitutionally acceptable protocols and guidelines promulgated by the appropriate agency.

Accordingly, the order and judgment (one paper) of Supreme Court, New York County (Edward J. Greenfield, J.), entered on or about June 26, 1995, which denied defendants' cross motion for summary judgment and granted plaintiff's motion for summary judgment and ordered, adjudged and declared, *inter alia*, that the regulations codified at 14 NYCRR 527.10 were promulgated by the Commissioner of the Office of Mental Health beyond his authority and without the consent of the Commissioner of Health and are thus invalid and unenforce-

able in their entirety and for all purposes, should be modified, on the law, to also order, adjudge and declare that the following provisions of the regulations promulgated by the Office of Mental Health and codified at 14 NYCRR 527.10: 14 NYCRR 527.10 (e) (2) (ii) and (ix); 14 NYCRR 527.10 (e) (2) (viii); and 14 NYCRR 527.10 (e) (3) (iii) and (v); 14 NYCRR 527.10 (e) (2) (iii) and (iv); and 14 NYCRR 527.10 (e) (3) (i), fail to provide for adequate notice and review procedures and therefore violate the Due Process Clause of the New York State Constitution (art I, § 6) and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and violate this State's common law as well as Public Health Law article 24-A and Social Services Law article 6, title 1, and otherwise affirmed, without costs.

MILONAS, J. P., ELLERIN, RUBIN and NARDELLI, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on or about June 26, 1995, which denied defendants' cross motion for summary judgment and granted plaintiff's motion for summary judgment and ordered, adjudged and declared, *inter alia,* that the regulations codified at 14 NYCRR 527.10 were promulgated by the Commissioner of the Office of Mental Health beyond his authority and without the consent of the Commissioner of Health and are thus invalid and unenforceable in their entirety and for all purposes, modified, on the law, to also order, adjudge and declare that the following provisions of the regulations promulgated by the Office of Mental Health and codified at 14 NYCRR 527.10: 14 NYCRR 527.10 (e) (2) (ii) and (ix); 14 NYCRR 527.10 (e) (2) (viii); and 14 NYCRR 527.10 (e) (3) (iii) and (v); 14 NYCRR (e) (2) (iii) and (iv); and 14 NYCRR 527.10 (e) (3) (i), fail to provide for adequate notice and review procedures and therefore violate the Due Process Clause of the New York State Constitution (art I, § 6) and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and violate this State's common law as well as Public Health Law article 24-A and Social Services Law article 6, title 1, and otherwise affirmed, without costs.